## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| Sofia W., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No. 3:21-cv-50461 |
| v. | ) | |
| | ) | Magistrate Judge Lisa A. Jensen |
| | ) | |
| Kilolo Kijakazi, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| *Defendant*. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sofia W. brings this action under 42 U.S.C. § 405(g) seeking reversal or a remand of the decision denying her application for supplemental security income.[1] For the reasons set forth below, the Commissioner's decision is reversed, and the case is remanded.

### I. Background

On September 13, 2019, Plaintiff filed an application for supplemental security income, alleging a disability beginning on February 1, 2019, because of a thyroid gland disorder, diabetes, high blood pressure, anemia, arthritis, left leg/hip injury, lumbar back injury, sleep apnea, asthma, and bronchitis. R. 142–43. At the time Plaintiff filed the application, she was 51 years old. R. 142.

A remote hearing on Plaintiff's application was held before an administrative law judge (ALJ) on May 25, 2021. R. 13. The ALJ issued a written decision on June 9, 2021, finding that Plaintiff was not disabled under 42 U.S.C. § 1382c(a)(3)(A) and thus not entitled to benefits. R. 25–26.

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c). Dkt. 10.

At step one of the inquiry, the ALJ found that Plaintiff's attempts to do customer service work from home in 2020 did not rise to the level of substantial gainful activity. R. 15. At step two, the ALJ found that Plaintiff had the severe impairments of "degenerative disc disease of the lumbar spine; degenerative joint disease of the left ankle, status-post fracture of the left tibia; degenerative joint disease of the right shoulder; obesity; and adjustment disorder with anxiety." R. 15–16. At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal a listed impairment. R. 17–19. The ALJ then found that Plaintiff had the residual functional capacity (RFC)

> to perform light work as defined in 20 CFR 416.967(b) except . . . occasionally push/pull with the upper extremities; no climbing ladders, ropes or scaffolds; occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling; frequent reaching bilaterally; avoid concentrated exposure to workplace hazards; able to understand, remember and carry out short and simple instructions in a predictable and routine work environment where she is able to work at her own pace but would be able to meet end-of-day production goals; and tolerate brief and superficial interactions with supervisors, coworkers, and the general public.

R. 19. Applying this RFC at step four, the ALJ found that Plaintiff could not return to her past relevant work as generally or actually performed. R. 23–24. Based on hearing testimony from an impartial vocational expert, the ALJ found at step five that a significant number of jobs existed in the national economy that Plaintiff could perform, such as merchandise marker, housekeeping cleaner, and inspector hand packer. R. 24–25.

After the Appeals Council denied Plaintiff's request for review on October 5, 2021, R. 1, Plaintiff filed the instant action. Dkt. 1.

Plaintiff argues that (1) the ALJ erred by cherry-picking evidence and failing to provide an accurate and logical bridge from the evidence to her RFC limitations, (2) the opinions of the state agency medical consultants cannot salvage the ALJ's decision because those opinions were

outdated and incomplete, and (3) the ALJ improperly played doctor by determining the functional impact of an MRI without subjecting it to medical scrutiny.

## II. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and [her] conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (quoting *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)). The reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

## III. Discussion

### A. Plaintiff's Ankle, Knee, Back, and Shoulder Impairments

Plaintiff has an extensive medical history, so the Court will limit its recitation of the facts to those directly relevant to the arguments addressed in this opinion.

When visiting her mother at the hospital on February 14, 2019, Plaintiff slipped and fell on some ice, fracturing her left tibia at the ankle. R. 425. Plaintiff underwent surgery on February 16, 2019, for an intramedullary nailing of the tibia. R. 433. Plaintiff was discharged from the hospital on February 19, 2019, and underwent inpatient and outpatient physical therapy. R. 432, 542.

Plaintiff reports that, since May 2019, she has experienced severe pain in her lower back, hips, legs, and feet that she attributes to the fall. R. 355.

Plaintiff first sought treatment for her lower back pain on July 1, 2019, reporting a pain level of 4/10 that would go away overnight but get worse throughout the day. R. 528. Plaintiff had "left paraspinal tenderness to palpation" but an otherwise normal examination, including a negative straight leg raising test bilaterally. R. 529. Plaintiff was prescribed cyclobenzaprine and naproxen (Aleve) as needed. R. 530.

On September 13, 2019, Plaintiff sought further treatment for pain that radiated down her left hip, knee, and ankle with a pain level "at rest currently 3/10 in the knee and tibia, 6/10 in the left hip, with activity 8/10 in the knee and tibia, 0/10 in the hip." R. 890–91. Plaintiff had mild swelling in her ankle and foot and walked with a minimally antalgic gait and no assistive device. R. 891. X-rays revealed no problems with Plaintiff's tibia or ankle, so she was referred to a specialist, Ryan C. Enke, M.D., "to evaluate her low back as the possible etiology of her pain." R. 891–92.

On October 3, 2019, Plaintiff reported to Dr. Enke that she had lower back pain that radiated down her left hip and knee that was aggravated by standing, sitting, lying down, and squatting. R. 887. Plaintiff reported that her pain was a 3/10 at rest and 6/10 with activity. R. 887. Plaintiff had mild left lower paraspinal tenderness and a Patrick test that was negative but "very tight in the hip musculature," but her examination was otherwise normal, including a negative straight leg raising test bilaterally. R. 887. Lumbar and hip X-rays taken that day were largely normal but showed sacralization of the L5 vertebra. R. 888. Plaintiff decided to try ice and home stretching, deferring physical therapy or injections. R. 888.

On October 22, 2019, Plaintiff saw Dr. Enke again, reporting that she "[wa]s doing worse

in comparison to [her] last visit," with a pain level of 0/10 at rest and 8/10 with activity. R. 884. Plaintiff again had "mild lower left paraspinal tenderness" and an otherwise normal examination. R. 884. Plaintiff reported that "[h]er insurance w[ould] not cover physical therapy but she ha[d] continued [a] home exercise program for over 6 weeks." R. 885. Dr. Enke found her symptoms "concerning for lumbar radiculopathy" and ordered a "lumbar spine MRI without contrast to assess for a disc herniation or spinal stenosis." R. 885.

>Plaintiff's lumbar spine MRI, taken on November 12, 2019, revealed

>>Retrolisthesis, a broad-based disc displacement most pronounced in the central position with a 1cm right-sided capsulosynovial cyst and moderate facet hypertrophy at the L4-5 level contributing to abutment of bilateral descending L5 nerves.

>>Shallow disc displacement, superimposed central protrusion, posterior annular tear, moderate to severe facet hypertrophy at the L5-S1 level contributing to abutment of bilateral exiting L5 nerves and abutment of the descending left S1 nerve.

R. 904. Plaintiff followed up with Dr. Enke on November 15, 2019, reporting a pain level of 5/10 at rest and 8/10 with activity. R. 881. Plaintiff had mild lower left paraspinal tenderness, tenderness at the left trochanteric bursa, and an otherwise normal examination. R. 881. Dr. Enke diagnosed Plaintiff with spondylosis with radiculopathy in the lumbar region, intervertebral disc displacement in the lumbar region, hypoesthesia of the skin, and greater trochanteric bursitis of the left hip. R. 882. Plaintiff and Dr. Enke discussed possible treatments, including epidural steroid injections and a spinal surgery option. R. 882. Plaintiff chose to proceed with physical therapy including traction, as well as injections. R. 882.

In a report dated December 3, 2019, state agency medical consultant Marion Panepinto, M.D., opined that Plaintiff could stand and/or walk for about 6 hours in an 8-hour workday, occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds. R. 148. Dr. Panepinto limited Plaintiff to light work with no more than occasional stooping and no limitations

on pushing, pulling, or reaching. R. 148–51.

Plaintiff attended four physical therapy sessions for her back pain between December 2019 and January 2020. R. 951, 960, 966, 972. At Plaintiff's initial evaluation on December 17, 2019, she reported back pain and numbness at a level of 8/10 that radiated from her tailbone to her left leg and hip pain of 6/10 on the outside of her left hip. R. 951. Plaintiff reported pain when walking, standing, sitting long periods, playing with her grandchildren, standing to cook, sleeping, carrying, and lifting. R. 954. Plaintiff reported that she had gained weight, walked with a limp, used a cane and sometimes a cart at the grocery store, and had bowel dysfunction and bladder incontinence. R. 951–54. Plaintiff stated that her doctor planned to refer her to surgery if physical therapy did not help. R. 952. Examinations revealed lumbar convexity on the right; reduced lumbar lordosis; protracted shoulders; tenderness in the lumbar spinous process, transverse processes, paraspinals, PSIS, and greater trochanter; observable muscle spasms of the lumbar paraspinals and right gluteal muscles; muscle guarding with all spinal motions; decreased range of motion and flexibility with pain and discomfort; back pain reproduced with a right straight leg raise; a positive right crossed straight leg raising test; positive FABER (Patrick) test, Scour, and FADIR tests of the left hip; and positive Scour, FADIR, and 90-90 Hamstring tests of the right hip. R. 952–53. Examinations also revealed normal reflexes, a negative left straight leg raising test, a negative Ober's test on the left hip, and a negative FABER (Patrick) test on the right hip. R. 953. The physical therapist believed that Plaintiff would benefit from ongoing skilled physical therapy intervention. R. 954. At the following sessions, the physical therapist reported that Plaintiff's limp and pain were improving and that she should continue physical therapy twice a week. R. 960–61, 966–67, 972–74.

Plaintiff visited Dr. Enke on January 16, 2020, and reported that she had been discharged from physical therapy for missing appointments. R. 998–99. Plaintiff said that her pain level was

6

8/10 at rest and 10/10 with activity. R. 998. Plaintiff again had mild lower left paraspinal tenderness and an otherwise normal examination including a negative straight leg raising test bilaterally. R. 998. Dr. Enke again ordered injections. R. 999. At the hearing, Plaintiff testified that she has never received injections because her insurance will not cover them unless physical therapy is unsuccessful, and she has been unable to complete physical therapy or provide documentation that she cannot complete physical therapy. R. 44–47.

In February 2020, Plaintiff completed a function report and a pain questionnaire. R. 355–57, 361–69. Plaintiff reported that she had constant pain in her lower back, hips, legs, and feet. R. 355. Plaintiff estimated that she could walk 5–8 feet from the door to the car with help, stand for 5–10 minutes at a time, and sit for 5–10 minutes at a time. R. 357, 366. Plaintiff reported that she sometimes used a cane, walker, or wheelchair and had difficulty sitting and reaching. R. 366–67. Plaintiff reported that although she had not yet scheduled surgery to attempt to relieve her pain, she was waiting to see a specialist to schedule surgery for her lower back. R. 356.

Also in February 2020, Plaintiff's husband completed a third-party function report. R. 373–80. He reported that Plaintiff had difficulty walking, standing, sitting, and reaching and estimated that Plaintiff could walk 10–12 feet before needing to rest. R. 378. He also reported that Plaintiff sometimes used a cane, walker, or wheelchair. R. 378.

In March 2020, Plaintiff had a telehealth visit with neurosurgeon Artur Szymczak, M.D. R. 1027. Dr. Szymczak ordered a left spine-bending X-ray and another lumbar MRI. R. 1081, 1085.

On April 14, 2020, a second state agency medical consultant, Sai Nimmagadda, M.D., reviewed Plaintiff's medical records. R. 173. Dr. Nimmagadda opined that Plaintiff could stand and/or walk for about 6 hours in an 8-hour workday, occasionally lift and/or carry 20 pounds, and

frequently lift and/or carry 10 pounds. R. 170. Dr. Nimmagadda limited Plaintiff to light work with some postural and environmental limitations but no limitations on pushing, pulling, or reaching. R. 170–74.

Plaintiff underwent the left spine-bending X-ray and lumbar MRI on May 15, 2020, showing that her lower lumbar spine degenerative disc disease was essentially unchanged relative to November 2019. R. 1084, 1086. Shortly thereafter, Plaintiff injured her right shoulder doing arm exercises while working from home. R. 1212. On May 26, 2020, Plaintiff had a telehealth visit with Dr. Bethune. Plaintiff complained of difficulty lifting her right arm, which caused pain to go down her wrist and into her hand. R. 1212. Dr. Bethune prescribed Aleve and shoulder stretches and ordered a shoulder MRI. R. 1212–13. The MRI, taken on June 5, 2020, showed: "1. [Moderate t]endinosis of the supraspinatus tendon with small focus of delamination along the critical zone of the supraspinatus tendon. 2. Right AC joint hypertrophic changes which does narrow the osseous out with [sic]. 3. Subacromial subdeltoid bursitis." R. 1173–74.

On June 2, 2020, Plaintiff saw Dr. Bethune in person for a preoperative evaluation; Plaintiff "anticipate[d] undergoing spinal surgery on unknown date of this year by Dr. Artur Szymczak." R. 1208. Plaintiff expected that she would be updated that day or the next about what type of surgery she would have. R. 1208. Plaintiff reported that her pain level was 4/10, that she still experienced nighttime incontinence and radicular symptoms down her left lower extremity, and that she had recently developed radicular symptoms down her right lower extremity. R. 1208–09. Plaintiff walked with a normal gait, "although slow and deliberate." R. 1209. Dr. Bethune noted that Plaintiff had chronic pain syndrome and gave Plaintiff a general clearance for surgery, noting that she was "of moderate perioperative risk." R. 1209–10. Dr. Buthane noted that she would share her findings with Dr. Szymczak. R. 1210.

On June 18, 2020, Plaintiff had another telehealth visit with Dr. Bethune and stated that she went to see "the Neurosurgeon" for her back and was told they would not do spinal surgery until she lost 80–100 pounds. R. 1206. Plaintiff told Dr. Bethune that "[s]he [wa]s fearful that she w[ould] be unable to meet that goal to get better," had been researching bariatric programs, and was interested in a referral for weight loss. R. 1206. Dr. Bethune referred Plaintiff to a bariatric specialist, noting that Plaintiff was "highly motivated to change her lifestyle and lose weight so she may be a surgical candidate for her back." R. 1207.

On July 15, 2020, Plaintiff met with Ishmeet Singh, M.D., at Rockton Pain Center. R. 1087. Dr. Singh noted that Dr. Janjua[2] was "planning an anterior approached L5-S1 Fusion" surgery but noted that Plaintiff was not a candidate for surgery due to her comorbidities. R. 1087–88. Plaintiff reported that her pain level was a 4 at rest and a 10 with activity in both sides of her lower back, describing the pain as "constant. woke from sleep, numbness, tingling, cramping. prickling, burning, sharp, aching, with radiation to the [left hip, right hip, left buttock, right buttock, right leg, left leg, left foot, right foot, left thigh, and right thigh]." R. 1087. Dr. Singh examined Plaintiff and found sensory changes, focal weakness, tenderness, positive bilateral straight leg raising test, positive facet loading bilaterally in the lower lumbar spine, and abnormal reflexes. R. 1088–89. Dr. Singh also noted normal results including normal strength, good muscle tone, negative FABER/Patrick test bilaterally, and spinal rotation without concordant pain. R. 1089. Based on this examination, Dr. Singh ordered injections. R. 1087–88, 1090. Plaintiff testified that she did not receive these injections due to insurance issues and that she "ha[s] to be at a certain weight in order to have that surgery done." R. 42.

---

[2] Although the record does not state whether Dr. Szymczak or Dr. Janjua was "the Neurosurgeon" who told Plaintiff she needed to lose weight for surgery, Plaintiff testified at the hearing, "Those are the only two that I saw. And I do need the surgery done on my back. But they want me to lose weight." R. 42.

On September 9, 2020, Plaintiff was found eligible for bariatric weight loss surgery. R. 1237. However, Plaintiff testified that she has made diet and exercise changes instead, trying to walk at least 30 minutes a day despite still having a limp. R. 43–44. Plaintiff reported that diet and exercise had brought her weight down from 217 pounds to 184 pounds as of May 5, 2021. R. 43.

At the administrative hearing on May 5, 2021, Plaintiff testified as described above and further testified that she was told to stay away from Aleve because of her liver fibrosis, but she takes Tylenol approximately once a week when her pain is too bad. R. 48–49. Plaintiff testified that although she was discharged from physical therapy for missing an appointment, "it was hurting more than working for [her]." R. 46. Plaintiff testified that she struggled with standing, walking, sitting, and reaching. R. 43–44, 47–48.

## B. Cherry-Picking and Mischaracterizing the Evidence

Plaintiff argues that the ALJ erred when she ignored abnormal findings relating to Plaintiff's back and hip pain. While the ALJ recognized that Plaintiff has degenerative disc disease of the lumbar spine, documented on MRI, she went on to say that "Physical examinations have not shown any motor, sensory or reflex deficits, and straight leg raising tests have all been negative bilaterally [R. 881, 884, 887, 998, 1001, 1004, 1007]." R. 21. This statement is directly contradicted by the record: At Plaintiff's initial physical therapy evaluation on December 17, 2019, she demonstrated observable spasms, pain, numbness, and a positive right crossed straight leg raising test. R. 952–53. When Plaintiff met with Dr. Singh on July 15, 2020, Plaintiff demonstrated focal weakness, sensory change, and abnormal reflexes, as well as a positive straight leg raising test bilaterally.[3] R. 1088–89. Although the ALJ might have concluded that these and other

---

[3] The Commissioner glosses over the July 2020 findings by stating that the ALJ only highlighted findings "over the next six month[s], from October 2019 through March 2020." Def.'s Br. at 6, Dkt. 14. Like the ALJ, the Commissioner overlooks the abnormal results from December 2019. R. 952–53. Moreover, the

abnormal results did not support a finding of disability, she erred by stating they were not in the record at all. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916–17 (7th Cir. 2003) (per curiam); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). In *Golembiewski*, the Seventh Circuit found that an ALJ's decision was "compromised by a mischaracterization of the medical evidence" when the ALJ remarked that certain spinal MRIs showed no herniations even though a doctor had opined that one MRI showed probable lumbrosacral herniation. *Golembiewski*, 322 F.3d at 917. The ALJ's decision in this case is likewise compromised because she mischaracterized what the medical evidence actually showed.

Even if the ALJ had not mischaracterized the record, however, it was error for the ALJ to disregard these directly contradictory medical findings without explaining why. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected."). Assuming negative straight leg raising tests and an absence of motor, sensory, and reflex deficits weigh against finding Plaintiff disabled, then positive straight leg raising tests and motor, sensory, and reflex deficits almost certainly weigh in favor of finding Plaintiff disabled.[4] Before concluding that the balance still tips against Plaintiff, the ALJ must explain why these abnormal findings deserve no weight or are outweighed by the normal findings. *Moore*, 743 F.3d at 1123.

In addition to mischaracterizing Plaintiff's examination results, the ALJ mischaracterized Plaintiff's attempts to obtain relief from her back pain. When concluding that "[t]here [wa]s no documented basis for limitation to sedentary work over any 12-month period," the ALJ found that

---

ALJ did not limit her analysis to any particular time frame, and the Commissioner's "attempt to supply a post-hoc rationale" for the ALJ's decision "runs contrary to the *Chenery* doctrine" and is improper. *Lothridge v. Saul*, 984 F.3d 1227, 1234–35 (7th Cir. 2021)

[4] For instance, documentation of a positive straight leg raising test, muscle weakness, sensory changes, and decreased deep tendon reflexes can satisfy certain criteria of Listing 1.15 for disorders of the skeletal spine resulting in compromise of a nerve root. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.00F2c, 1.15B.

"[Plaintiff's] primary focus seems to be her lower back pain, but she takes only occasional over-the-counter Tylenol for relief and has done little to pursue more aggressive treatments, such as injections." R. 22–23.

However, as detailed above, several medical records document that Plaintiff was evaluated by a neurosurgeon who recommended an anterior approached L5-S1 fusion but that she first had to lose a significant amount of weight before she could undergo the procedure.[5] Records detail that she consulted with a bariatric specialist in an attempt to lose the weight and had successfully lost 33 pounds by the time of her administrative hearing. As such, the ALJ's conclusion that Plaintiff has "done little" to seek relief from her back pain is belied by the record evidence. Even if this conclusion did not rise to the level of mischaracterization, it certainly amounts to improper cherry-picking. Plaintiff testified to her attempts to obtain back surgery and her need to lose weight in order to be a candidate for such surgery. Medical records appear to corroborate this, yet the ALJ makes no reference to the recommended spinal surgery or Plaintiff's attempts to lose weight in order to undergo the back surgery. On remand, the ALJ must address Plaintiff's efforts to obtain spinal surgery and provide an adequate explanation so the Court can trace the path of her reasoning. *Wozniak v. Kijakazi*, No. 20-CV-740, 2021 WL 4146434, at *5–6 (E.D. Wis. Sept. 13, 2021) (remanding when ALJ failed to build accurate and logical bridge between claimant's pursuit of aggressive treatment and ALJ's assessed RFC).

---

[5] This Court notes that there do appear to be missing records – specifically, a note from the neurosurgeon. However, many other records reference Plaintiff's visit to Dr. Szymczak, and records from the neurosurgery center include testing authorized and acknowledged by Dr. Szymczak. If the ALJ deliberately omitted any reference to Plaintiff's documented efforts to pursue spinal surgery based on a lack of corroborating evidence from Dr. Szymczak or Dr. Janjua, then the ALJ should have said as much and explained how she made every reasonable effort to obtain medical reports from the neurosurgeons before casting other evidence aside. *See* 20 C.F.R. §§ 416.912(b), 416.945(a)(3) (describing ALJ's duty to develop the record). If the ALJ simply did not notice Plaintiff's cited evidence, then she failed to satisfy her obligation to consider "*all* of the relevant evidence in the case record" when making her RFC determination. SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996) (emphasis in original).

In remanding the case on this basis, the Court is not reweighing the evidence, given that the ALJ never weighed this evidence in the first place. When reversing on this basis, "[the Court does] not state that the ALJ's view of the facts is ultimately wrong; [it] simply hold[s] that her apparent selection of only facts from the record that supported her conclusion, while disregarding facts that undermined it, is an error in analysis that requires reversal." *Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014). Although the ALJ may ultimately conclude that this evidence has no persuasive weight, the Court cannot make that assumption on appeal. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) ("Our review is limited also to the ALJ's rationales; we do not uphold an ALJ's decision by giving it different ground to stand upon.").

## C. Stale Opinions

Plaintiff also argues that the ALJ's decision cannot be salvaged by the opinions of the state agency medical consultants because they were outdated and incomplete. Pl.'s Br. at 8–10, Dkt. 13. Plaintiff notes that the state agency medical consultants did not have Plaintiff's May 2020 reports of shoulder pain that radiated down to her wrist and into her fingers; Plaintiff's June 2020 right shoulder MRI showing moderate tendinosis, hypertrophic changes, and bursitis; Plaintiff's abnormal exam results relating to her back and hip pain from June 2020 and July 2020;[6] evidence that Plaintiff would have been a candidate for back surgery in June 2020 except that she was 80–100 pounds overweight; and Plaintiff's September 2020 approval for bariatric surgery. Pl.'s Br. at 8–10, Dkt. 13. Plaintiff argues that this evidence reasonably could have changed the state agency medical consultants' opinions. *Id.* at 9 (quoting *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir.

---

[6] Plaintiff also cites abnormal results from December 2019. Pl.'s Br. at 8, Dkt. 13 (citing R. 952–55). It appears that the agency received these results on March 14, 2020, before Dr. Nimmagadda reviewed Plaintiff's file on reconsideration, R. 158, even though Dr. Nimmagadda did not explicitly analyze them, *see* R. 166–73. The Court will not factor the December 2019 results into its staleness inquiry, but the ALJ must nevertheless confront these results on remand for the reasons explained in the Court's cherry-picking analysis above.

2018)). The Court agrees.

The Commissioner does not deny that there is new, significant evidence in the record that the state agency medical consultants did not review. Instead, the Commissioner argues that any error is harmless because "[P]laintiff fails to indicate what additional limitations her selective citations support." Def.'s Br. at 4, Dkt. 14. The Commissioner cites *Jozefyk v. Berryhill*, in which the Seventh Circuit found harmless error in an ALJ's RFC assessment, stating that "[b]ecause [the claimant] did not testify about restrictions in his capabilities related to concentration, persistence, or pace deficits, and the medical record does not support any, there are no evidence-based restrictions that the ALJ could include in a revised RFC finding on remand." *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019). Here, Plaintiff testified and indicated in her function report that she had pain and difficulty reaching and lifting with her right arm. R. 48, 366. Moreover, her medical records document the same pain and difficulty lifting her right arm and include a diagnosis of shoulder pain supported by objective medical evidence in the form of MRI results. R. 1173–74, 1212–13. If the state agency reviewers had had this new and significant information, it may have altered their recommendations with respect to Plaintiff's limitations on lifting, pushing, pulling, or reaching. *See Jozefyk*, 923 F.3d at 498. Accordingly, the ALJ's error is not harmless.

In addition, the ALJ relied on the state agency reviewers' opinion that Plaintiff was capable of light work despite her severe impairments of degenerative disc disease of the lumbar spine. The state agency doctors specifically referred to Plaintiff's normal examination results in support of their conclusion. These doctors did not have records showing Plaintiff's subsequent abnormal examination findings relating to her degenerative disc disease, records indicating that she had been recommended for spinal surgery, or records of her efforts to lose weight in order to obtain relief through spinal surgery. This additional information was significant and may have altered the

opinions of the state agency doctors.

The Commissioner then argues that Plaintiff's arguments, if correct, "would also necessitate an ALJ to have a medical expert at nearly every hearing, as it is not uncommon for there to be a lag between the state agency physicians' reviews and the ALJ's decision." Def.'s Br. at 4, Dkt. 14. But Plaintiff is not arguing that the state agency medical consultants' opinions are outdated due to the lapse of time. Indeed, although 13 months elapsed between Dr. Nimmagadda's review and the hearing,[7] Plaintiff's shoulder injury and MRI occurred within the first 2 months, suggesting that Dr. Nimmagadda's opinion was outdated long before the hearing. Rather, Plaintiff is arguing, as the Seventh Circuit has held, that a reviewing physician's opinion is outdated when "later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Lambert*, 896 F.3d at 776 (quoting *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018)). Here, Plaintiff's MRI reasonably could have changed Dr. Nimmagadda's opinion that Plaintiff required no limitations on pushing, pulling, or reaching. R. 23. Not all later evidence will satisfy this standard, *see Durham v. Kijakazi*, 53 F.4th 1089, 1095–96 (7th Cir. 2022), although MRI imaging often does. *Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021) (unpublished) (collecting cases). Moreover, the ALJ is not required to have a medical expert testify at a hearing on remand as long as the ALJ makes her determination with the benefit of some expert opinion interpreting the MRI results. *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018) (per curiam) ("The ALJ had many options to avoid this error; for example, he could have sought an updated medical opinion.").

The Commissioner also argues that the ALJ's reliance on stale opinions is harmless

---

[7] The Commissioner incorrectly cites October 2020 as the date of Dr. Nimmagadda's review. Def.'s Br. at 3, Dkt. 14. Dr. Nimmagadda's review is actually dated April 14, 2020, even though Plaintiff's request for consideration was not denied until October 2020. R. 176.

because "[n]o medical opinions supported [P]laintiff's claim of disability or concluded [P]laintiff was more limited than what the ALJ assessed." Def.'s Br. at 3, Dkt. 14. In support of this proposition, the Commissioner cites *Best v. Berryhill*, in which the Seventh Circuit stated, "There is no error when there is 'no doctor's opinion contained in the record that indicated greater limitations than those found by the ALJ.'" *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018) (unpublished) (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)). In *Best*, however, the state agency doctors had the opportunity to recommend limitations based on the evidence the plaintiff cited—there, a diagnosis of radiculopathy. *Best v. Acting Comm'r of Soc. Sec. Admin.*, No. 17-CV-23, 2017 WL 6523929, at *4 (N.D. Ind. Dec. 21, 2017), *aff'd*, 730 F. App'x 380 (7th Cir. 2018). Here, the state agency doctors had no knowledge of Plaintiff's May 2020 shoulder injury or June 2020 MRI, no evidence of the abnormal examination results related to Plaintiff's lumbar spine disease, and no evidence related to Plaintiff's possible back surgery, and thus no opportunity to consider whether Plaintiff would need additional RFC limitations based on these impairments. When an ALJ fails to submit this kind of new, significant evidence to medical scrutiny, the ALJ's reliance on a state agency doctor's stale opinion is reversible error. *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014); *see Kemplen*, 844 F. App'x at 887 (reiterating this standard); *see also Best*, 2017 WL 6523929, at *4 ("[I]t appears that the Plaintiff's arguments would, in essence, have invited the ALJ to improperly substitute her personal observations for the considered judgments of [the state agency medical consultants].").

### D.    Playing Doctor

Plaintiff argues that the ALJ erred not just by relying on outdated opinions but also by relying on her own lay opinion when translating Plaintiff's right shoulder MRI into RFC limitations of occasional pushing and pulling and frequent reaching, given that there were no

medical opinions addressing Plaintiff's shoulder issues. Pl.'s Br. at 9–10, Dkt. 13. Plaintiff argues that "the ALJ [wa]s not qualified to determine the functional impact of the imaging herself" and improperly "played doctor." *Id.*

The Commissioner responds that the ALJ "acknowledged that a[n] MRI of [Plaintiff's] right shoulder documented degenerative joint disease" and "appropriately considered the longitudinal medical evidence" when assessing a limitation to frequent reaching. Def.'s Br. at 4–6, Dkt. 14. The Commissioner argues that "[t]he fact that the ALJ found [P]laintiff more restricted than the state medical experts shows 'reasoned consideration given to the evidence [Plaintiff] presented.'" *Id.* at 6 (quoting *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019)).

In reply, Plaintiff argues that the ALJ was not qualified to interpret objective medical imaging, as opposed to a medical opinion, and reiterates that no medical source addressed Plaintiff's shoulder issues at all. Pl.'s Reply at 3, Dkt. 15. The Court agrees that the ALJ improperly played doctor when translating Plaintiff's right shoulder MRI into RFC limitations.

An ALJ plays doctor when she "interpret[s] the results of an MRI and us[es] that interpretation as a basis for denying benefits." *Durham*, 53 F.4th at 1095 (quoting *McHenry*, 911 F.3d at 871). The Seventh Circuit has held that playing doctor is reversible error even when the ALJ interprets an MRI in a way that arguably favors the claimant. *Akin*, 887 F.3d at 317–18 ("The MRI results may corroborate [the claimant's] complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion.").

Here, the ALJ recited the MRI results and "limited the claimant to pushing and pulling occasionally with the upper extremities, and frequent reaching bilaterally." R. 22. The ALJ recognized that these limitations were not reflected in Dr. Nimmagadda's report but added them

"to account for the claimant's shoulder impairments." R. 23. Missing from the ALJ's decision is any explanation of *how* these limitations account for Plaintiff's MRI showing "moderate tendinosis of supraspinatus tendon with small focus of delamination along critical zone of supraspinatus tendon; right AC joint hypertrophic changes; and subacromial subdeltoid bursitis." R. 22 (citing R. 1173–74). Although the ALJ's lay opinion of Plaintiff's capabilities for lifting, pushing, pulling, and reaching may ultimately prove correct, the ALJ erred by playing doctor by summarizing the MRI results rather than submitting them to medical scrutiny. *Goins*, 764 F.3d at 680.

Finally, the Commissioner's resort to *Burmester* is misplaced. Although the ALJ was certainly required to give reasoned consideration to the evidence Plaintiff presented, *see Burmester*, 920 F.3d at 510, the ALJ overstepped her role when she "'independently . . . compared the MRI results with earlier medical records' to determine the existence and level of the claimant's impairments." *Durham*, 53 F.4th at 1095 (quoting *McHenry*, 911 F.3d at 871) (alteration in original). In other words, the reasoned consideration contemplated by *Burmester* does not extend to an ALJ's attempt to interpret the significance of highly complex medical tests or procedures such as an MRI. *Durham*, 53 F.4th at 1095 (noting that the Seventh Circuit has frequently criticized ALJs for this problematic approach).

### IV. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, and the Commissioner's motion is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this opinion.

Date: March 2, 2023          By: _Lisa A. G_____
                                  Lisa A. Jensen
                                  United States Magistrate Judge